# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SANDRA GARZA, as )
the personal representative )
of THE ESTATE OF BRIAN SICKNICK )
)
    *Plaintiff,* )
)
    v. )
)
DONALD J. TRUMP, et al., )    Case No. 1:23-cv-00038 (APM)
)
    *Defendants.* )
)

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS TRUMP AND TANIOS'S MOTIONS TO DISMISS FIRST AMENDED COMPLAINT

> *Well, thank you very much, and you know what that was, I call them the 'J-6 hostages,' not prisoners. I call them the hostages, what's happened. And you know, it's a shame."*
>
> -   Defendant Donald Trump, speaking at a campaign rally in Houston, Texas, November 2, 2023[1]

## I.    INTRODUCTION

Defendant Donald Trump's Motion to Dismiss the First Amended Complaint (ECF 49-1) begins with a perfunctory nod to Capitol Police Officer Brian Sicknick's death, calling it "a tragedy." But by the end of that first paragraph, Defendant Trump abandons all sympathy for the deceased and complains Plaintiff has "cherry-picked" his statements, "mischaracterized political speech as unlawful conspiracy," and "fail[ed] to take into account [Defendant Trump's] repeated and unequivocal urging for peace, and simply ignore[d] the absolute immunity provided by the

---

[1] Brett Samuels, *Trump describes imprisoned Jan. 6 rioters as "hostages"*, The Hill (Nov. 2, 2023, 5:57 PM), https://thehill.com/homenews/campaign/4290939-trump-jan-6-capitol-rioters-hostages/ (last visited Nov 15, 2023).

Constitution to [Defendant Trump]."  The paragraph asserts that the January 6, 2021, rioters who stormed the United States Capitol in an effort to violently stop Congress from certifying the 2020 Election—Defendant Trump's rallygoers who chanted for the murder of the Vice President, and who attacked Capitol Police Officers with hockey sticks, flag poles, and chemical sprays—did so based upon "an unreasonable interpretation" of Defendant Trump's speech.  To reiterate: Defendant Trump now claims a speech in which he knowingly told an armed crowd[2] to "fight like hell," that he will "never concede," and that "you'll never take back our country with weakness" was interpreted unreasonably.

Defendant Trump has raised these arguments before.  He remains wrong and he remains liable: The Plaintiff has not cherry-picked from Defendant Trump's statements, and Plaintiff encourages this Court—as this Court has done before—to consider Defendant Trump's January 6, 2021, speech in its entirety.  *See Thompson v. Trump*, 590 F. Supp. 3d 46, 83 (D.D.C. 2022) (considering Defendant's speech in full).  Defendant Trump's retort that he "repeated[ly]" and "unequivocal[ly]" urged for peace on January 6, 2021, is simply false.  One cannot "unequivocally" urge an armed crowd to "fight like hell" peacefully.  Further, no matter how many times he says otherwise, no court has *ever* held that Presidents enjoy "absolute immunity."

---

[2] Cassidy Hutchinson, the former aide to Defendant Trump's Chief of Staff, testified before the January 6th Select Committee on June 28, 2022: "But when we were in the offstage announce tent, I was part of a conversation — I was in — I was in the vicinity of a conversation where I overheard the President say something to the effect of, you know, I - - I don't effing care that they have weapons. They're not here to hurt me. Take that effing mags away. Let my people in. They can march to the Capitol from here. Let the people in. Take the effing mags away.." *Here's every word from the sixth Jan. 6 committee hearing on its investigation*, NPR (Jun. 28, 2022), https://www.npr.org/2022/06/28/1108396692/jan-6-committee-hearing-transcript (last visited Nov 15, 2023).; *See also* Caroline Linton et al., *Former aide Cassidy Hutchinson testifies on Jan. 6 warnings, pardon requests, and Trump trying to grab the wheel*, CBS News (Jun. 29, 2022, 7:30 AM), https://www.cbsnews.com/live-updates/january-6-committee-hearing-cassidy-hutchinson-testimony-trump-wheel/ (last visited Nov 15, 2023)*;* Tom Jackman, Rachel Weiner & Spencer S. Hsu, *Evidence of firearms in Jan. 6 crowd grows as arrests and trials mount*, The Washington Post (Jul. 8, 2022), https://www.washingtonpost.com/dc-md-va/2022/07/08/jan6-defendants-guns/ (last visited Nov 15, 2023) (detailing evidence of weapons).

Finally, the Defendant's attempt to distance himself from his supporters—his claim that they acted upon "an unreasonable interpretation" of his speech—should be particularly surprising to the many rioters now in prison for doing exactly what Defendant Trump exhorted them to do—to "fight like hell," "never concede," and "stop the steal." (ECF 35-3, First Amended Complaint ["FAC"] ¶¶ 10, 77).  This handwashing is negated by Defendant Trump's many public statements on the subject, including the above recent opening quote, which heartlessly alleges those who have pled guilty to crimes against the United States—crimes he encouraged,[3] exploited,[4] and watched with sadistic delight[5]—are political prisoners being held for ransom.

***

Plaintiff Sandra Garza, Executor for the Estate of deceased Capitol Police Officer Brian Sicknick, by and through undersigned counsel, files this Response to Defendants Trump and Tanios's Motions to Dismiss her First Amended Complaint (ECF 49-1 and 50-1, respectively).  Plaintiff's earlier filing, ECF 42 at pages 15-23, has already addressed Defendant Khater's Motion to Dismiss the First Amended Complaint ("FAC"), and is incorporated by reference herein.

In short, Defendants Trump and Tanios have responded to Plaintiff's First Amended Complaint by reiterating the same arguments from all three Defendants' prior filings.  Their present Motions offer scant new arguments and should respectfully be denied.

First, Plaintiff addresses Defendant Trump's Constitutional claims that have been fully briefed in prior filings.  Second, Plaintiff addresses the Defendants' arguments that she has failed to state a claim within her five causes of action.  Third, Plaintiff addresses Defendant Tanios's

---

[3] Indictment at ¶ 96, *U.S. v. Trump*, Case No. 1:23-cr-00257-TSC, ECF No. 1 (D.D.C., Aug. 1, 2023).
[4] *Id.* at ¶¶ 10(e), 96, 119.
[5] *Here's every word from the sixth Jan. 6 committee hearing on its investigation*, NPR (Jun. 28, 2022), https://www.npr.org/2022/06/28/1108396692/jan-6-committee-hearing-transcript (last visited Nov 15, 2023); *See also* Indictment, *supra* note 3, at ¶ 108.

contention that any tort claims arising from Officer Sicknick's death are barred by the "Professional Rescuer Doctrine."  In sum, Plaintiff has well-pled her causes of action against all three Defendants and this case should proceed to discovery.

## II.   DEFENDANT TRUMP'S "ABSOLUTE IMMUNITY" ARGUMENTS REMAIN INCORRECT

As stated in Plaintiff's response to Defendant Trump's Opposition to her Motion For Leave to Amend her Complaint (ECF 42), the parties have already briefed Defendant Trump's "Absolute Immunity" arguments.  *See* ECF 42 at 3-4 (inviting Defendant Trump to adopt his earlier assertions about "Absolute Immunity" to his answer to the First Amended Complaint).  Perhaps taking that invitation too literally, Defendant Trump copies the same argument, practically verbatim, from his initial Motion to Dismiss into this present filing.  *Compare* ECF 24-1, pages 8-20 with ECF 49-1, pages 8-20.

Plaintiff therefore adopts herein her previous counterarguments at ECF 25, pages 2-15, (Plaintiff's Opposition to Motion to Dismiss By Defendant Donald J. Trump).[6]  Defendant Trump remains wrong about "Absolute Immunity" for the following reasons:

### a.  Presidential Immunity is not absolute.

In *Nixon v. Fitzgerald*, 457 U.S. 731, 757 (1982), the Supreme Court ruled that President Nixon was immune from suit because the complained-of action—firing a federal employee— "lay well within the outer perimeter of [his] authority."  Fifteen years later in *Clinton v. Jones*, 520 U.S. 681 (1997), the Court ruled that the *Fitzgerald* rationale—that Presidents need to function without fear that a particular decision could give rise to personal liability—is not

---

[6] Plaintiff also recognizes that these issues are currently before the D.C. Circuit, having been litigated and lost by Defendant Trump in *Thompson v. Trump*. *See generally Thompson v. Trump*, 590 F. Supp. 3d 46 (D.D.C. 2022).

absolute.  Presidential immunity does not apply to "unofficial conduct." 520 U.S. at 693-694

(1997); *see also Thompson*, 590 F. Supp. 3d at 75 (the immunity for civil money damages as

stated in *Fitzgerald* is "unquestionably capacious, though not categorical.").

Many courts—including this Court—have noted the limitations of presidential immunity.

For instance, a President is not immunized from the inconvenience of subpoenas.  *See Trump v.*

*Vance*, 140 S.Ct. 2412, 2431 (2020) (holding that "the President is neither absolutely immune

from state criminal subpoenas seeking his private papers nor entitled to a heightened standard of

need.").  A President may be sued for equitable relief even with respect to official duties.  *See*

*Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).  Nor is a President protected against

suits for "unofficial conduct" with no relation to a president's official responsibilities.  *Jones*,

520 U.S. at 693.  And Presidential immunity certainly does not immunize threats against state

election officials or stirring up a violent mob.  *Thompson*, 590 F. Supp. 3d at 82-84.

Thus, a former president is subject to lawsuits like this one, which seeks redress for harm

caused by actions outside his official capacity.

> **b.  The use of the "bully pulpit" on "matters of public concern" does not *ipso facto*
> cloak Defendant Trump with immunity.**

This Court has ruled previously: "[i]n evaluating a presidential claim of absolute immunity,

the court must consider the relationship of the challenged conduct to the claimed corresponding

function of the President." *Thompson*, 590 F. Supp. 3d at 83.  Here, as in previous filings,

Defendant Trump claims he is immune from suit because his speeches and tweets around January

6, 2021, were a use of the "bully pulpit" regarding a matter of public concern—his self-constructed

claims of election interference—and are therefore within the "outer perimeter of his official

duties." ECF 49-1 at 17.

This Court has ruled: "Blanket immunity cannot shield a President from suit merely because his words touch on matters of public concern. The context in which those words are spoken and what is said matter." *Thompson*, 590 F. Supp. 3d at 80.  Applying that test, this Court has already determined:

> For present purposes it suffices to say that while the [January 6, 2021] Speech did touch on matters of public concern (namely President Trump's pledge to work on election laws in a second term), the main thrust of the Speech was not focused on policy or legislation. It was to complain about perceived cases of election fraud that led President-elect Biden to win more votes in closely contested states, to urge members of Congress to object to certain state certifications, and to exhort the Vice President to return those certifications to those states to be recertified. Much like the tweets leading up to the January 6 Rally, the words spoken by the President— without delving into the motivation behind them—reflect an electoral purpose, not speech in furtherance of any official duty.

> *Id.* at 83.

Noting their context and upon actually reading his speech, this Court ruled that Defendant Trump's acts were aimed at securing his incumbency—not official conduct within the outer perimeter of Presidential duties.  *Id.*, at 82-84.  Thus, this Court has already addressed Defendant Trump's arguments before and found them lacking.

Unlike this case, cases *supporting* Executive Immunity are all grounded in obvious examples of executive-level functions unique to the presidency—that is, duties one must actually be the president to discharge.  For instance, Executive Immunity covers, among other actions, making personnel decisions (*see Fitzgerald*, *supra*); determining contract awards (*see In re Global Crossings, Ltd. Securities Litigation*, 314 F. Supp. 2d 172 (S.D.N.Y. 2003)); enacting federal legislation (*see State of Mississippi v. Johnson*, 71 U.S. 475 (1866)); and managing the logistics of a national emergency (*see Freeman v. United States*, No. 20-13341, 2020 WL 7383191, at *1 (D.N.J. Dec. 16, 2020)).  Defendant Trump's actions surrounding January 6, 2021, were neither

kith nor kin to any Article II power or mandate—to the contrary, they were wholly outside his official acts.

Presidents are immunized from suit where the underlying act is linked to the president's job description, and not a personal or unofficial undertaking. But it is not a function of the presidency to secure or perpetuate incumbency as Defendant Trump attempted on or about January 6, 2021. *Thompson*, 590 F.Supp. 3d at 82. The Defendant's words and actions, as alleged in the First Amended Complaint, were not "speech in furtherance of any official duty," were not within the outer perimeter of his constitutional role, and are not immunized from suit. *Id*. at 83.

## III.    THE FIRST AMENDED COMPLAINT IS NOT BARRED BY THE FIRST AMENDMENT.

As in his prior Motion to Dismiss, ECF 24-1, Defendant Trump again claims the First Amendment shields him from liability. ECF 49-1 at 14-20. He once again claims his speech was petitioning activity undertaken in his official capacity; that his speech does not meet the standard for incitement; and that "incitement is limited to true threats," such that a holding to the contrary would subject Washington, D.C.'s anti-riot laws to facial challenges. Respectfully, these arguments are incorrect.

Just as it has before, this Court should find that Defendant Trump's January 6, 2021, speech is not protected by the First Amendment. *Thompson*, 590 F.Supp. 3d at 108 ("Only in the most extraordinary circumstances could a court *not* recognize that the First Amendment protects a President's speech. But the court believes this is that case.") (italics in original).

### a.    The *Brandenburg* standard for incitement

As this Court has observed, there is no exact test for what constitutes unlawful incitement and courts have distilled *Brandenburg* to different tests. *Id*. at 112-113. Nonetheless, certain

similarities amongst Supreme Court cases post-*Brandenburg* are instructive, and they all weigh against First Amendment protection for Defendant Trump's speech. In *Hess v. Indiana*, 414 U.S. 105, 108-09 (1973) (*per curiam*) the Court held that language that was "intended to produce, and likely to produce, imminent disorder," and directed to specific persons, runs afoul of the First Amendment. In *N.A.A.C.P. v. Claiborne Hardware*, 458 U.S. 886, 929 (1982), the Court reasoned that one may look to evidence of a speaker's "authorization of wrongful conduct" to determine whether their speech constitutes unlawful incitement. And, along with the actual words spoken, the *context* for the speech—that is, the setting in which it takes place—can illuminate whether the speech was unlawful incitement. *See FCC v. Pacifica Foundation*, 438 U.S. 726, 744 (1978); *Schenk v. United States*, 249 U.S. 47, 52 (1919) ("[T]he character of every act depends upon the circumstances in which it is done […] The most stringent protection of free speech would not protect a man falsely shouting fire in a theater […]").

As this Court has summarized, the *Brandenburg* exception to the First Amendment is that language that is meant to incite or produce imminent lawless action, and is likely to incite or produce such action is *not protected speech. Thompson*, 590 F.Supp. 3d at 111-112. Defendant Trump's speech and conduct fall squarely within that category; the First Amendment does not protect Defendant Trump's exhortations to his rallygoers on January 6, 2021. *Id*. at 115.

      **b.  Defendant Trump's speech exceeds the *Brandenburg* standard for incitement**

Applying *Brandenburg* as it actually is, and not how Mr. Trump would prefer it be interpreted, his speech is at least "plausibly" unprotected by the First Amendment. *Id*. Therefore, this Court should respectfully deny his Motion to Dismiss on First Amendment grounds.

### 1. The language was intended to produce, and was likely to produce, lawlessness from its audience.

Defendant Trump told the crowd, "they rigged an election."  He added, "They rigged it like they've never rigged an election before."  FAC at ¶ 75.  He said "We will never concede, it doesn't happen.  You don't concede when there's theft involved.  Our country has had enough.  We will not take it anymore and that's what this is all about."  *Id.* at ¶ 77.  Right before turning the crowd loose on the U.S. Capitol, Mr. Trump exclaimed, "You'll never take back our country with weakness.  You have to show strength, and you have to be strong."  *Id.* at ¶ 81.

As this Court has held, "There is no safe haven under *Brandenburg* for the strategic speaker who does not directly and unequivocally advocate for imminent violence or lawlessness, but does so through unmistakable suggestion and persuasion."  *Thompson*, 590 F.Supp.3d at 115.  And, as this Court has also ruled, "These words stoked an already inflamed crowd," and therefore "plausibly crossed the line into unprotected territory."  *Id*. at 116.

### 2. Defendant Trump's speech authorized and encouraged imminent wrongful conduct.

Defendant Trump was—and still is—falsely telling half the country, including all of those at his rally, that the 2020 election was hijacked by President Biden who had illegally usurped power and directly undermined the will of the people.  As part of that fantasy, on January 6, 2021, Defendant Trump called for immediate action to stop the counting of electoral votes.

Unlike those cases where the Supreme Court has found the threat of lawless conduct to be too remote, here Defendant Trump's acts risked imminent wrongful conduct the moment they were shouted.  In *Claiborne Hardware*, 458 U.S. at 902, for instance, the Court found that a threat of *future* "discipline" for violators of a boycott was not likely to produce imminent disorder.  And in *Hess*, 414 U.S. at 107 the Court found that a protestor's promise that "We'll take the f-----g street

*later*" (emphasis added), or "We'll take the f------g street again" was not immediate enough to trigger *Brandenburg*.

In contrast, as this Court has noted, any claim that Defendant Trump's January 6, 2021, words did not stoke imminent violence is belied by the full context of that day.  Phrases like, "We fight like hell and if you don't fight like hell, you're not going to have a country anymore," immediately before instructing followers to "walk down Pennsylvania Avenue," make it at least "plausible that those words were implicitly 'directed to inciting or producing imminent lawless action and [were] likely to produce such action.'" *Thompson,* 590 F.Supp. 3d at 115 (quoting *Brandenburg*).

Defendant Trump argues that because he "clearly reminded his supporters to 'peacefully and patriotically make [their voices] heard' at the Capitol," his speech could not even *plausibly* be seen as incitement.  ECF 49-1 at 26.  But, as this Court has noted, these words must be contrasted against his exhortation, an hour later, to "fight like hell."   *Thompson*, 590 F.Supp. 3d at 117. Whatever Defendant Trump said about peaceful protest on January 6th—and it wasn't much—he was undercut by his own, later statements.  Within the context of the larger speech and the circumstances surrounding it, his use of the words "peaceful," and "patriotic," was at best an apparent afterthought and does not convert his speech into protected expression.  *Id.*

In light of this context, his January 6th Rally Speech was "speech … brigaded with action" that was plausibly "directed to inciting or producing imminent lawless action and likely to incite or produce such action."  *Id.*, *quoting Brandenburg*, 395 U.S. at 456; *Hess*, 414 U.S. at 108–09.

     **c.  Defendant Trump's proposed additions to the *Brandenburg* analysis have no basis in law, and this Court has already rejected them.**

As he has also argued previously, Mr. Trump's Motion to Dismiss attempts to layer additional and unnecessary requirements upon *Brandenburg*.  Respectfully, this Court has already rejected each of these contentions and should do so again here.

     **1.  *Brandenburg* is not grounded in "true threats."**

First, Defendant Trump argues that incitement is "limited to true threats" and that "mere encouragement is quintessential protected advocacy," with D.C.'s anti-riot laws subject to a facial challenge if this Court would hold otherwise.  ECF 49-1 at 28, *quoting United States v. Miselis*, 972 F.3d 518, 536 (4th Cir. 2020).  To be sure, "true threats" are not protected by the First Amendment.  *Watts v. United States*, 394 U.S. 705, 708 (1969) (*per curiam*).  But "true threats" and incitement are separate types of unprotected speech: "Incitement creates a risk that third parties will inflict violence on the victim, whereas threats engender fear and intimidation that usually reach the victim directly." *First Amendment - Freedom of Speech - Second Circuit Affirms Threats Conviction in Internet Speech Case*, 127 Harv. L. Rev. 2585, 2589 (2014).  What "true threats" and "incitement" share is that, in both types of speech, the threat of wrongdoing is imminent.  That is what matters to the analysis—not whether the imminent threat is made directly to the intended victim or instead is routed through third parties.

     **2.  *Brandenburg* does not compel this Court to consider Defendant Trump's speech in light of other politicians' speeches.**

Second, Defendant Trump argues that allowing this case to proceed will "clutter the dockets of federal courts and incentivize using courts as a weapon against political opponents." ECF 49-1 at 27-28.

Again, this Court has already rejected this "what-aboutism" argument that points towards what other politicians have said and complaints about the "floodgates of litigation" that could open regarding other speeches and protests. This Court has stated, "[e]ach case must be evaluated on its own merits." *Thompson*, 590 F.Supp. 3d at 117. A *Brandenburg* analysis does not compel analogy to other speeches; it asks merely whether there was an implicit call for imminent violence or lawlessness. *Id.* (noting Defendant Trump called for thousands 'to fight like hell' immediately before directing them to march toward Capitol, where Defendant Trump knew targets of their ire were at work).

### 3. There is no "negligence" factor within *Brandenburg*.

Third, Defendant Trump argues "one cannot have negligent liability for incitement" and therefore "an individual cannot be liable for incitement based on how others interpreted his speech." ECF 49-1 at 27. For this proposition, he cites to the dissent from *Morse v. Frederick*, 551 U.S. 393 (2007) and argues that a *Brandenburg* analysis would rely too much upon how others interpreted the speech. This Court has already ruled that the speech at issue was inciteful and unprotected regardless of how anyone actually reacted to it (although the mob's reaction here certainly is telling). *Thompson*, 590 F.Supp. 3d at 117.

***

This Court has previously rejected Mr. Trump's First Amendment defenses. Respectfully, it should do so again here.

## IV. PLAINTIFF HAS STATED RECOVERABLE CLAIMS AGAINST ALL THREE DEFENDANTS

The First Amended Complaint pleads five causes of action against Defendants Trump, Tanios, and Khater. Previously, Defendants Tanios and Trump objected to the First Amended

Complaint as "futile" (ECF 37 and 39, respectively); and Defendant Khater filed a Motion to Dismiss the First Amended Complaint (ECF 40-1). Plaintiff's Omnibus Reply to those three filings, (ECF 42) addressed the Defendants' contentions that she has failed to state claims for which relief may be granted, and, as stated above, Plaintiff incorporates that filing into this Response.

Each cause of action in the First Amended Complaint states a claim for which relief may be granted.

### a. Plaintiff's Wrongful Death claim is well-pled.

Plaintiff incorporates herein the arguments raised in her earlier filing, ECF 42 at pages 8-11, addressing the arguments Defendants Trump and Tanios have reiterated in their present motions as to her Wrongful Death and Survivor's Act claims: First, Plaintiff has established her standing to recover as a domestic partner under the Wrongful Death Act. *See* ECF 42 at 8-10; ECF 35-3 at ¶ 8 ("On March 25, 2021, [Plaintiff] was duly qualified as the Executor for the Estate of Brian Sicknick in the Circuit Court of Fairfax County, Virginia."); *see also* D.C. Code § 16-2701. Second, Plaintiff has pled the other necessary elements for a Wrongful Death claim, including causation and damages, contrary to the Defendants' assertions. *See* ECF 49-1 at 27-29; ECF 50-1 at 8-9.

### 1. Plaintiff has established that she may recover under the Wrongful Death Act as she is a domestic partner *and* executor for the estate.

Officer Sicknick's will—which was provided as an exhibit four months ago, ECF 42-2—repeatedly names Ms. Garza as his domestic partner and the will's executor. *See* ECF 42-2 at 2-4. Plaintiff is given specific bequests, as well as all of the remainder of the estate. *Id.* at 2-3 (naming Ms. Garza as recipient of Mr. Sicknick's car, house and contents, as well as the sole primary remainder beneficiary of the estate).

In their current and previous Motions, both Defendants Trump and Tanios make the same argument that Plaintiff must be married to Officer Sicknick or registered as a domestic partner in order to pursue claims under the Wrongful Death Act.  *See* ECF 49-1 at 26; ECF 50-1 at 8; ECF 33-1 at 14; ECF 24-1 at 37.  Respectfully, these arguments are incorrect.

D.C. Code § 16-2702, cited by Defendant Trump, ECF 49-1 at 36, explicitly states any wrongful death action is to be brought by the "personal representative of the deceased."  The term "personal representative" as used in the District of Columbia's Wrongful Death Act statute is limited to officially appointed executors and administrators.  *Saunders v. Air Fla., Inc*., 558 F. Supp. 1233, 1235 (D.D.C. 1983), *quoting Strother v. District of Columbia*, 372 A.2d 1291 (D.C. 1977).

Ms. Garza is named and was certified as the executor of Mr. Sicknick's will.  *See* ECF 42-2 at 4; *see also* ECF 25-1 (Clerk of the Circuit Court of Fairfax County, Virginia certifying Sandra Garza is qualified as Executor for estate of Brian Sicknick).  Therefore, she is a duly qualified personal representative able to bring this suit.

Defendant Tanios cites to D.C. Code § 32-701(3) for the proposition that "parties must be registered as domestic partners with [sic] the District of Columbia" in order to qualify as domestic partners within the meaning of the Wrongful Death Act.  ECF 50-1 at 8.  Just as Defendant Tanios misquoted this provision in his Opposition to Plaintiff's Motion for Leave to Amend, ECF 37-1 at 11, he again truncates the full sentence misleadingly. That section ***actually*** says, "Domestic partnership means the relationship between 2 persons who become domestic partners by registering in accordance with § 32-702(a) ***or whose relationship is recognized under § 32-702(i)***." (Emphasis added).

Sections, § 37-702(i)(1) and (2) are meant to be read together, and are best quoted in full:

§ 32-702(i)(1):    Except as provided in paragraph (2) of this subsection, relationships established in accordance with the laws of other jurisdictions, other than marriages, that are substantially similar to domestic partnerships established by this chapter, as certified by the Mayor, shall be recognized as domestic partnerships in the District. The Mayor shall establish and maintain a certified list of jurisdictions so recognized. The Mayor shall broadly construe the term "substantially similar" to maximize the recognition of relationships from other jurisdictions as domestic partnerships in the District.

§ 32-792(i)(2):    If the Mayor has not yet certified, pursuant to paragraph (1) of this subsection, that the laws of a jurisdiction permit the establishment of relationships substantially similar to domestic partnerships established by this chapter, and if the laws of that jurisdiction prescribe that the relationship, regardless of the term or phrase used to refer to the relationship, has all the rights and responsibilities of marriage under the laws of that jurisdiction, the relationship shall be recognized as a domestic partnership in the District and the Mayor shall include that jurisdiction in the certified list required under paragraph (1) of this subsection.

Contrary to Defendant Tanios' assertions, D.C. law does not require that domestic partners be registered, it merely gives them the *right* to do so.  *See generally Yeh v. Hnath*, 294 A.3d 1081, n. 2 (D.C. 2023) ("The District of Columbia permits a couple in a non-marital and committed relationship to register as each other's sole domestic partner and thus be entitled to certain legal benefits").

Officer Sicknick's will, and D.C. law, thus provide alternate, suitable grounds to find that Plaintiff has adequately pled she is Officer Sicknick's "domestic partner," "personal representative," and "executrix" for the purpose of stating a claim under the Wrongful Death Act, D.C. Code § 16-2701.

> ## 2.  Plaintiff has sufficiently pled the other elements of a Wrongful Death claim, including causation and damages.

Plaintiff has sufficiently alleged causation, damages, and all other elements that constitute a wrongful death claim.  Recovery under the Wrongful Death Act requires that the Plaintiff prove

"(1) the standard of care owed by the [defendant] to [the deceased] and (2) a breach of that standard by the [defendant] that (3) caused injury to [the deceased] before his death," and finally, that "(4) [the victim's] death caused injury to the plaintiffs themselves."  *Burton v. United States*, 668 F. Supp. 2d 86, 98 (D.D.C. 2009).  Plaintiff has pled all of these elements.  FAC at ¶¶ 118-137.

Defendant Trump argues that causation between his actions and Officer Sicknick's death was not adequately alleged.  ECF 49-1 at 27-29; *see also* ECF 24-1 at 28-40.  First, his arguments to the effect that a "copy of the report or citation" of the medical examiner's investigation into Sicknick's death, or proof of "communication between President Trump and the other two defendants" would be needed, is premature.  As explained in Plaintiff's previous Omnibus Response, ECF 42, Plaintiff is not required to allege the exact mechanism of Officer Sicknick's death at this stage, as proximate causation is ordinarily a question left for the fact finder.  *See Beach TV Properties, Inc. v. Solomon*, 306 F. Supp. 3d 70, 96 (D.D.C. 2018).

Nevertheless, Plaintiff *has* alleged sufficient facts linking Trump's actions to Officer Sicknick's death.  *See* FAC ¶¶ 107-111, 116a, 117a, 121-131, 136.  Plaintiff has claimed there is a "reasonable connection" between all three Defendants actions and the damage suffered by the Plaintiff.

Additionally, Defendant Trump argues that recovery for the loss of financial support and value of services is "not contemplated by the Wrongful Death statute," with individual damages "personal in nature" not recoverable under such a claim. ECF 49-1 at 27. Defendant Tanios, perhaps contrarily, argues that Plaintiff failed to plead any facts demonstrating her reception of financial support or services of "pecuniary value." ECF 50-1 at 8. The ability to obtain such

recovery, indeed the requirement to plead it, is precisely what differentiates a wrongful death claim

from a survival action.  *Burton*, 668 F. Supp. 2d at 97; *see also Nelson v. Am. Nat. Red Cross*,

26 F.3d 193, 199 (D.C. Cir. 1994) ("The survival statute compensates the estate for injuries caused

to the decedent while the wrongful death provision gives a right of action to his survivor who

suffers a loss because of his death."); *de Letelier v. Republic of Chile*, 502 F. Supp. 259 (D.D.C.

1980) (allowing damages for pain and suffering, as well as punitive damages); *Runyon v. D.C.*,

463 F.2d 1319 (D.C. Cir. 1972) (allowing damages to spouse for decedent's future net income).

Plaintiff pled such damages to herself, including lost financial support "that Officer Sicknick

furnished" and could have furnished in the future, as well as services Officer Sicknick would have

provided.  FAC at ¶¶ 134-135. With this, Plaintiff has pled every element to recover under the

Wrongful Death Act.

***

Plaintiff has pled the facts necessary to sustain an action for wrongful death, including

causation, damages, and her standing to recover as the personal representative of Officer

Sicknick's estate.

### b.  Plaintiff has sufficiently pled an underlying tort and Officer Sicknick's injury to recover under the Survival Act.

As Defendant Trump's own cited precedent sets out, Plaintiff *can* bring a cause of action

under the Survival Act so long as there is an underlying, substantive tort, which Plaintiff has

alleged.  *See* D.C. Code § 12-101; ECF 49-1 at 29-30; *see also Powers-Bunce v. D.C.*, 479 F.

Supp. 2d 146, 160 (D.D.C. 2007) ("§ 12–101 merely provides the legal basis for Plaintiff *to

bring tort claims* […] that belonged to [the decedent] before his death.") (italics added).

Specifically, Survival Act claims are possible under a negligence theory.  *Id.*  The

Survival Act is also expressly meant as complimentary to the Wrongful Death Act.  *Graves v.*

*United States*, 517 F. Supp. 95, 99 (D.D.C. 1981) ("Under the law of the District of Columbia, if a tort results in death, two causes of action arise, one under the Survival Statute […], and the other under the Wrongful Death Act [.]"). While wrongful death claims are meant to compensate those left living, recovery under the Survival Act is "comprised of that which the deceased would have been able to recover had he lived." *Id*. (*citing Semler v. Psychiatric Institute of Washington, D.C., Inc*., 575 F.2d 922, 925 (D.C. Cir. 1978)).

 Plaintiff's Survival Act claim asserts that the Defendants' unlawful acts "directly and negligently caused the Wrongful Death of Officer Brian Sicknick." FAC at ¶ 139.  Plaintiff also incorporated other paragraphs in her Amended Complaint, including those laying out the elements of her wrongful death complaint. *Id*. at ¶¶ 138, 119-137.  In addition, this incorporation by reference means that Plaintiff incorporated the factual allegations tending to establish Defendants' intentional or negligent, and unlawful conduct, as well as its causal relationship with Officer Sicknick's injuries and death. *Id.* at ¶¶ 123-130, 136; *cf.* ECF 50-1 at 9 (claiming Plaintiff did not sufficiently plead injuries of deceased).

A survival action is "a negligence action pursued by the estate of the decedent victim— all that need be proven are the ordinary elements of negligence." *Burton*, 668 F. Supp. 2d at 97. In addition to the many factual allegations mentioned above, Plaintiff lays out in depth how they support a negligence *per se* claim. FAC at ¶¶ 160-175.  By doing so, and especially in light of the assumptions favoring the non-movant in a motion to dismiss, Plaintiff has alleged the requisite underlying tort and the requisite elements to recover under the Survival Act.

### c.  Plaintiff has adequately pled a Conspiracy to Violate Civil Rights pursuant to 42 U.S.C. 1985(1).

First, Plaintiff has sufficiently pled the elements of an unlawful conspiracy to interfere with the duties of an officer pursuant to 42 U.S.C. § 1985(1).  Additionally, contrary to Defendant

Trump's assertion, Presidential Immunity does not shield him from liability for money damages when conspiring to violate someone's civil rights.

### 1.  Plaintiff has pled a prohibited agreement against a protected officer.

Plaintiff has pled the presence of a conspiracy, a protected officer, and an interference with his duties.  As this Court has ruled previously, a plaintiff pleading conspiracy "need *not* show that the members entered into any express or formal agreement, or that they directly, by words spoken or in writing, stated between themselves what their object or purpose was to be, or the details thereof, or the means by which the object or purpose was to be accomplished."  *Smith v. Trump*, No. 21-CV-02265 (APM), 2023 WL 417952, at *6 (D.D.C. Jan. 26, 2023) (emphasis added; *citing Thompson*, 590 F. Supp. 3d at 97.

Therefore, Plaintiff has adequately pled that the Defendants engaged in a conspiracy to both obstruct Congress *and* Officer Sicknick from discharging their official duties.  FAC at ¶¶ 90-95, 156-158.  Plaintiff has clearly alleged that these Defendants interfered with, attacked, and prevented Officer Sicknick from protecting the Capitol, and that they did so in concert with each other and multiple other people who have pled guilty to various criminal charges stemming from their actions around January 6. This is sufficient to allege conspiracy.

To allege an agreement, Plaintiff has to "allege the existence of any events, conversations, or documents indicating there was an agreement between the defendants to violate his rights." *Bush*, 521 F. Supp. 2d at 68; *see also McCreary v. Heath*, 2005 WL 3276257, at *5 (D.D.C. Sept. 26, 2005).  Plaintiff sets out numerous alleged facts in detail and describes the specific actions of Defendants Trump, Khater, and Tanios before and during January 6, 2021, that led to the attempted interference with the duties of Congress, Vice President Pence, and Officer Sicknick. FAC at ¶¶ 145-159.

Plaintiff has adequately pled that the Defendants engaged in a conspiracy to both obstruct Congress *and* Officer Sicknick from discharging his official duties as a Capitol Police Officer tasked with defending the Capitol's Lower West Terrace. *Id*. at ¶¶ 90-95, 156-158.  Plaintiff, standing in the shoes of Officer Sicknick, falls precisely into the group statutorily intended to claim recovery, as § 1985 "authorizes a party that is injured in his person or property to bring suit to recover damages for such injury against any one or more of the conspirators of a conspiracy proscribed by § 1985(1)."

### 2. Plaintiff may recover monetary damages from Defendant Trump under 42 U.S.C. § 1985.

Defendant Trump's effort to assert and extend presidential immunity to monetary damages is misplaced.  A President is not immune from monetary damages for actions outside the outer perimeter of his official duties.  *Clinton v. Jones*, 520 U.S. 681, 694-95 (1997) (*citing Nixon*, 457 U.S. at 757, 759).  As another D.C. District Court has held, with regards to the slew of other actions Defendant Trump undertook to overturn the 2020 Election, the conduct on or around January 6, 2021, was "purely political" and well beyond the scope of presidential immunity, and attacks on the counting of election ballots would certainly not have constituted "executive action in defense of the Constitution." *Michigan Welfare Rts. Org. v. Trump*, 642 F. Supp. 3d 98, 105 (D.D.C. 2022).

The same court also held that "there is no immunity defense for Former President Trump for 'unofficial acts' which 'entirely concern his efforts to remain in office for a second term.'" *Id.* (*citing Thompson* 90 F. Supp. 3d at 84); *see also United States v. Chrestman*, 525 F. Supp. 3d 14, 33 (D.D.C. 2021) ("[A] President cannot, within the confines of his constitutional authority, prevent the constitutionally mandated certification of the results of a Presidential Election or

encourage others to do so on his behalf, nor can he direct an assault on the coequal Legislative branch of government.").

Although Defendant Trumps seeks immunity for damages claimed under 42 U.S.C. § 1985(1), this would be unprecedented, particularly as the statute includes no exception for Presidential misconduct or any other authorization in federal law.  *See generally Mittleman v. U.S. Treasury*, 773 F. Supp. 442 (D.D.C. 1991) (dismissing complaint by former government employee because Congress explicitly denied remedy to her class in statute, showing intent to deny remedy for damages).

Immunizing Defendant Trump from money damages would fly in the face of a range of precedent, both broadly and specifically holding that he is liable for damages.  Recovery from him must remain possible under 42 U.S.C. § 1985.

### d.  Plaintiff has adequately pled Negligence *Per Se* claims against all Defendants.

Under District of Columbia law, violations of criminal statutes can create civil liability. *See Marusa v. District of Columbia,* 484 F.2d 828, 834 (D.C. Cir. 1973) (setting forth "guidelines for determining whether violation of a criminal statute can create civil liability").   In her First Amended Complaint, Plaintiff specified two different criminal statutes which serve as vehicles for her two different negligence claims. Both have been pled adequately.

### 1.  The D.C. Riot Act (D.C. Code § 22-1322) gives rise to a Negligence *Per Se* claim.

This Court has expressed "skepticism" that a violation of the D.C. Riot Act can give to a negligence claim in tort, and has previously held that this statute cannot sustain a claim of negligence per se. *Thompson, supra* at 119; *Smith v. Trump*, 2023 WL 417952 at *9 (D.D.C. Jan. 26, 2023).

Respectfully, Plaintiff submits that D.C. Code §§ 22-1322, "Rioting or inciting to riot"

Does actually satisfy the *Marusa* factors.  First, anti-riot statutes are designed to promote safety.  Second, Officer Sicknick, as a policeman tasked with maintaining civil order is a member of the class of persons designed to be protected by that law.  Third, while the law applies generally to all persons, a "riot" is defined as an assemblage of "5 or more persons," thus the duty imposed by that law applies *only* to persons congregating in groups of a certain size.

Plaintiff respectfully argues she has established the Defendants violated the anti-riot law in a way that gives rise to civil liability.  Additionally, and recognizing this Court's prior skepticism, Plaintiff respectfully argues *Marusa's* three-part rule is too rigid an interpretation of its predecessor *Whetzel v. Jess Fisher Mgmt. Co*., 282 F.2d 943 (D.C. Cir. 1960).  *Whetzel* held, more generally, "If by creating the hazard which the ordinance was intended to avoid, it brings about the harm which the ordinance was intended to prevent, it is a legal cause of the harm." *Id*. at 947 (internal citation omitted).  The Defendants' actions precisely caused the harm D.C.'s Anti-Riot law is designed to prevent.

### 2.  18 U.S.C. § 1752(a)(2) and (4) impose specific guidelines that govern behavior, and therefore give rise to a claim for Negligence *Per Se*.

Count V alleges Defendants Tanios and Khater are liable for Negligence *Per Se* arising from their violations of a federal law, 18 U.S.C. § 1752(a)(2) and (4).  By their plain language, 18 U.S.C. § 1752(a)(2) and (4) are statutes designed to promote public safety as they proscribe disorderly and disruptive conduct.  The statute is clearly designed to protect a specific class of people—those who may appear in restricted buildings or grounds (as defined in the statute) such as Capitol Police Officers and Secret Service protectees.  The duty imposed—to not engage in physical violence under the narrowly stated circumstances—is aimed at proscribing specified conduct by persons within those restricted places.  It is therefore not a generally drawn law, but applies only under specific conditions.  *See generally United States v. Puma*, 596 F. Supp. 3d 90

(D.D.C. 2022) (denying January 6 criminal defendant's motion to dismiss, and discussing conduct prohibited by 18 U.S.C. § 1752 as not unduly vague).

Thus, Plaintiff has identified a specific criminal statute which the Defendants plausibly violated, giving rise to a claim for Negligence *Per Se*.  *See generally Whetzel, supra*, at 946 ("[W]here legislation prescribes a standard of conduct for the purpose of protecting life, limb, or property from a certain type of risk […] then the statutory prescription of the standard will at least be considered in determining civil rights and liabilities.") (internal citation omitted); *McCracken v. Walls-Kaufman*, 717 A.2d 346, 354 ("Violation of a statute may give rise to a civil cause of action, and may constitute Negligence *Per Se* if the statute is meant to promote safety, if the plaintiff is a member of the class to be protected' by the statute, and if the defendant is a person upon whom the statute imposes specific duties.) (internal quotation omitted).

Pursuant to 18 USC § 1752(a)(2), a crime is committed when any person "knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions."

The First Amended Complaint plainly alleges that Defendants Khater and Tanios engaged in disorderly and disruptive conduct which interfered with the counting of the Electoral Votes in proximity to a restricted place.  FAC at ¶¶ 89-95.

Pursuant to 18 USC § 1752(a)(4), a crime is committed when any person "knowingly engages in any act of physical violence against any person or property in any restricted building or grounds."  For the purposes of the statute, "restricted building or grounds" includes "any posted, cordoned off, or otherwise restricted area … of a building or grounds where the President

or other person protected by the Secret Service is or will be temporarily visiting; or of a building or grounds so restricted in conjunction with an event designated as a special event of national significance*." Id.* at 1752(c)(1)(B)-(C).  These elements are also properly alleged in the First Amended Complaint:

First, the First Amended Complaint alleges Defendants Khater and Tanios participated in the January 6, 2021 riot at the U.S. Capitol and assaulted Officer Sicknick during the certification of the Electoral College votes while Vice President Mike Pence was visiting the Capitol.  FAC at ¶ 93, 171.

Second, the Lower West Terrace of the Capitol is obviously part of the Capitol's restricted grounds, and Defendant Tanios, has already signed a proffer, of which this Court can take judicial notice, to that effect, and implicating his co-Defendant.  Defendant Tanios has agreed that "[he] was walking on restricted grounds" and "Co-Defendant Julian Khater was walking behind [him]." *See* ECF 42-4, Defendant Tanios's "Proffer of Evidence" at ¶11.

Third, the First Amended Complaint amply establishes that Defendants Khater and Tanios knew they were entering restricted grounds or buildings.  *See generally U.S. v. Bursey*, 416 F.3d 301 (4th Cir. 2005) (interpreting *mens rea* component of 18 U.S.C. § 1752 as "not a close question" where evidence established law enforcement presence cordoning off area).  The First Amended Complaint alleges Defendants Khater and Tanios met near police barricades, FAC at ¶ 90; and that they and others began pulling down those barriers. *Id*. at ¶ 93.

Therefore, Plaintiff has alleged facts sufficient to support her contention that Defendants Khater and Tanios violated a federal law in ways giving rise to a cause of action.  Their illegal acts caused harm to an officer in a manner that 18 U.S.C. § 1752 is specifically designed to proscribe and prevent.

## V.     THE "PROFESSIONAL RESCUER DOCTRINE" DOES NOT APPLY TO INJURIES SUSTAINED FIGHTING OFF VIOLENT COUP ATTEMPTS

Defendant Tanios reasserts the same "Professional Rescuer Doctrine" argument he raised in opposition to Plaintiffs' Motion for Leave to Amend.  *Compare* ECF 37 at 15-16, ECF 50-1 at 11-12.  Respectfully, he is still incorrect and has not improved upon his argument to address the counterpoints made in Plaintiff's Omnibus Reply.  ECF 42 at 14-15.

As stated in the Omnibus Reply, Plaintiff has not alleged that Officer Sicknick was a "professional rescuer."  But even if Capitol Police Officers are "professional rescuers," his argument still fails.  "Public servants, like firemen and police officers […] do not assume the risk of all injury in the course of their duties."  *Gillespie v. Washington*, 395 A.2d 18, 21 (D.C. 1978) ("We mean only to preclude recovery by professional rescuers for injuries occasioned by hazards which are neither hidden nor unknown to them in the course of their work, nor nonincidental to that work.").

The Professional Rescuer Doctrine bars recovery by a professional rescuer when the "hazard ultimately responsible for causing the injuries is inherently within the ambit of those dangers which are unique to and generally associated with the particular rescue activity."  *Melton v. Crane Rental Co.*, 742 A.2d 875, 877 (D.C. 1999).  Officer Sicknick's injuries were not suffered in the regular ambit of his professional responsibilities.  The January 6, 2021, Capitol attack was a *sui generis* horror.  It was a coup attempt.  It was *atmospheric tumult*.

January 6, 2021, marked "the first ever presidential transfer of power marred by violence." *Thompson* 590 F. Supp. 3d 46, 62 (D.D.C. 2022).  The Capitol attack was a massive and violent riot.  For the first and only time in American history, the seat of government was overrun by domestic insurrectionists.  To say that Capitol Police Officers holding their lines while fighting off

thousands of armed rioters were engaged in the regular course of business is to propose an idea with no limiting principle.

Under Defendant Tanios's read of the events of that day, it's difficult to fathom any on-the-job injury suffered by a policeman that would give rise to a claim against his assailant. The same cases Defendant Tanios cites make that point abundantly clear: "the doctrine does not preclude recovery when the hazard is hidden, unknown, or nonincidental to the professional rescuer's work; one cannot fairly say the professional rescuer has assumed the risks of such hazards." *Young v. Sherwin-Williams Co. Inc.*, 569 A.2d 1173, 1178 (D.C. 1990) (internal citation omitted).

## VI.    CONCLUSION

For the reasons stated herein and in Plaintiff's Response to Defendant Khater's Motion to Dismiss, ECF 42 at 15-23, this Court should deny all three Defendants' Motions to Dismiss.

Date: **November 15, 2023**                                  Respectfully submitted,

                                                                                  *s/Matthew Kaiser*
                                                                         _____
                                                                         KAISERDILLON PLLC
                                                                         Matthew Kaiser (D.C. Bar No. 486272)
                                                                         Noah Brozinsky (D.C. Bar No. 1655789)
                                                                         1099 Fourteenth Street, N.W., 8th Fl.
                                                                         Washington, D.C. 20005
                                                                         Tel: (202) 640-2850
                                                                         Email: mkaiser@kaiserdillon.com
                                                                                     nbrozinsky@kaiserdillon.com

                                                                                  *s/Philip Andonian*
                                                                         _____
                                                                         CALEBANDONIAN PLLC
                                                                         Philip Andonian (D.C. Bar No. 490792)
                                                                         Joseph Caleb (D.C. Bar No. 495383)
                                                                         1100 H Street, N.W. – Ste. 315
                                                                         Washington, D.C. 20005

Tel: (202) 953-9850
Email:  phil@calebandonian.com
         joe@calebandonian.com

*s/Mark S. Zaid*

_____

Mark S. Zaid, Esq. (D.C. Bar #440532)
Bradley P. Moss, Esq. (D.C. Bar #975905)
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20036
(202) 498-0011
(202) 330-5610 fax
Mark@MarkZaid.com
Brad@MarkZaid.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on November 15, 2023, a copy of the foregoing was filed with the Clerk of Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

*/s/ Noah Brozinsky*

Noah Brozinsky
*Attorney for Plaintiff*